IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                           Criminal Case No. 3:24cr111

TONY WILFORD,

   Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Tony Wilford's First Motion to

Dismiss the Indictment (the "Motion"). (ECF No. 14.)[1] In the Motion, Mr. Wilford contends

that his indictment under 18 U.S.C. . (ECF No. 15, at 1.) Mr. Wilford contends that the officer

obtained the evidence pursuant to an unlawful seizure in violation of the Fourth Amendment of

the United States Constitution.[2] (ECF No. 15, at 2–3.)    For the reasons that follow, the Court

will deny the Motion to Suppress. (ECF No. 15.)

## I. Procedural History and Findings of Fact

### A.    Procedural History

On August 6, 2024, a grand jury indicted Mr. Wilford on one count of Possession of a

Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) An arrest

warrant was issued the same day. (ECF No. 4.) Mr. Wilford was arrested and had his initial

---

[1] The Court employs pagination assigned by the CM/ECF docketing system.

[2] The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but
upon probable cause, supported by Oath or affirmation, and particularly describing the
place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

appearance on August 15, 2024. (ECF Nos. 5, 6.) On September 5, 2024, Mr. Wilford filed the Motion to Suppress. (ECF No. 15.) The United States responded to the Motion to Suppress, and Mr. Wilford replied. (ECF Nos. 16, 19.) On November 14, 2024, the Court heard evidence and oral argument, after which the Court took the matter under advisement. (ECF No. 26.)

## B.      **Findings of Fact**

On May 2, 2024, while on patrol, Officer Barnes-Christian and Officer Walker stopped at a convenience store at 1538 Mechanicsville Turnpike to conduct a merchant check[3] after midnight. (ECF No. 28 ("Tr.") 8:17–22; 20:19–24; Govt. Ex. 1, at 00:28:58–29:08.) Officer Walker was driving the patrol car. (Tr. 10:16–17; 26:16–18.) Upon entering the parking lot, Officer Barnes-Christian exited the passenger side of the patrol car. (Govt. Ex. 1, at 00:29:03– 00:29:06.) Officer Walker drove the patrol car around the side of the store to park. (Tr. 26:16– 18.) As Officer Barnes-Christian approached the entrance of the store, he observed Defendant Mr. Wilford, who was leaving the store, clutching his right arm to his right side with his arm in what Officer Barnes-Christian considered "an abnormal position." (Tr. 19:17–20:2; Govt. Ex. 1, at 00:29:14–19.) Officer Barnes-Christian testified that "[b]ased on [his] training and experience and dealing with persons with firearms,[4] if they have a firearm in their jacket . . . they usually have their arm clutched to it, just to try to keep it concealed or just keep it on it just so it's sitting there." (Tr. 20:2–7.) Officer Barnes-Christian further testified that if somebody else had held

---

[3] As explained by Officer Barnes-Christian, a merchant check involves officers visiting local businesses and ensuring there are no issues. (Tr. 8:17–21.) Officer Barnes-Christian affirmed that merchant checks can be used to investigate possible criminal activity. (Tr. 8:24– 9:1.)

[4] During his testimony, Officer Barnes-Christian affirmed he had been involved in over 150 firearm investigations in the past two years, many of which involved concealed weapons. (Tr. 18:22–19:3.)

his or her arm in the same position as Mr. Wilford, he would have stopped them or asked them questions. (Tr. 32:3–6.)

As Mr. Wilford walked out of the convenience store, continuing to clutch his arm to his side, Officer Barnes-Christian approached the door to enter. (Govt. Ex. 1, at 00:29:11–00:29:16.) The parties' accounts of what occurred next differ. Officer Barnes-Christian testified that he stepped back as Mr. Wilford was exiting the store. (Tr. 21:3–5.) Mr. Wilford testified that when he was "exiting the store, [Officer Barnes-Christian] stepped in [his] path" such that he did not "have [any] other choice but to interact with him." (Tr. 34:19–24.)

Immediately as they met, Officer Barnes-Christian asked Mr. Wilford, "You good?", to which Mr. Wilford responded, "Yeah." (Govt. Ex. 1, at 00:29:18–19; ECF No. 26-2 ("Govt. Ex. 1A"), at 1.) Officer Barnes-Christian next asked, "You got a concealed permit for that firearm right there, buddy?", while gesturing towards Mr. Wilford's right side. (Govt. Ex. 1, at 00:29:19–21; Govt. Ex. 1A, at 1.) Mr. Wilford answered, "Huh?" (Govt. Ex. 1, at 00:29:22; Govt. Ex. 1A, at 1.) Officer Barnes-Christian said, "It's not legal in the state of Virginia", to which Mr. Wilford responded, "I didn't know that." (Govt. Ex. 1, at 00:29:25–28; Govt. Ex. 1A, at 1.)

Without interruption, the exchange continued in a non-confrontational tone. Officer Barnes-Christian said, "Ok. What do you got, a nine?", to which Mr. Wilford responded, "Huh?", and leaned closer to Officer Barnes-Christian. (Govt. Ex. 1, at 00:29:29–31; Govt. Ex. 1A, at 1.) Officer Barnes-Christian repeated his question, asking, "Is it a nine?", to which Mr. Wilford responded, "Yeah." (Govt. Ex. 1, at 00:29:30–31; Govt. Ex. 1A, at 1.) Officer Barnes-Christian responded, "Ok. And you say it doesn't have a concealed, right? How old are you by the way?" (Govt. Ex. 1, at 00:20:32–35; Govt. Ex. 1A, at 1.) Mr. Wilford answered, "I'm 25."

3

(Govt. Ex. 1, at 00:20:35–36; Govt. Ex. 1A, at 1.)  Officer Barnes-Christian then stated, "25, ok so you already know.  Ok.  It's right here?" and gestured to Mr. Wilford's right jacket pocket. (Govt. Ex. 1, at 00:29:36–41; Govt. Ex. 1A, at 1.)  In response to Officer Barnes-Christian's question, Mr. Wilford looked down at his right side and lifted his arm up.  (Govt. Ex. 1, at 00:29:42–43.)  This entire exchange occurred in less than thirty seconds.  (Govt. Ex. 1, at 00:29:14–43.)

At that point in time, Officer Barnes-Christian stated, "I'm just going to pat you down real quick", and patted down the exterior of Mr. Wilford's right side.  (Govt. Ex. 1, at 00:29:43–45; Govt. Ex. 1A, at 1.)  He then said, "It's right here, right?  Ok.  It's fine, I'm just going to recover it, ok?  It's inside?  Hanging in your jacket?  Ok."  (Govt. Ex. 1, at 00:29:44–53; Govt. Ex. 1A, at 1.)  Officer Barnes-Christian reached inside Mr. Wilford's jacket where he had gestured toward earlier, and pulled out a firearm.  (Govt. Ex. 1, at 00:29:48–56.)  Mr. Wilford showed no resistance.  Officer Barnes-Christian did not use force; indeed, he warned Mr. Wilford each time before he touched him.  Shortly thereafter, Officer Walker approached Officer Barnes-Christian and Mr. Wilford.  (Govt. Ex. 1, at 00:30:02–04.)  After checking Mr. Wilford's information and confirming he was a convicted felon, Officers Barnes-Christian and Walker placed Mr. Wilford under arrest.  (Tr. 27:10–13.)

## C.     Summary of the Present Suppression Motion

In his Motion to Suppress, Mr. Wilford contends that Officer Barnes-Christian violated his Fourth Amendment right against unreasonable seizures by detaining him without reasonable, articulable suspicion that he was engaged in criminal activity.  (ECF No. 15, at 3, 5–6.)  The unreasonable seizure, Mr. Wilford argues, began when Officer Barnes-Christian "blocked his path as he exited a store and immediately asked him questions about possessing a firearm."

4

(ECF No. 15, at 3.) To remedy this violation of his Fourth Amendment rights, Mr. Wilford seeks to exclude the firearm obtained during the unreasonable seizure and accompanying evidence. (ECF No. 15, at 1.)

### D.       Standard of Review

"The proponent of a motion to suppress has the burden of establishing that his [or her] own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *see also United States v. Bowman*, 106 F.4th 293, 300 (4th Cir. 2024) ("the defendant bears the burden of proof on a motion to suppress"). "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974).

## II. Analysis

The Court will deny Mr. Wilford's Motion to Suppress. (ECF No. 15.) Even assuming, without deciding, that Officer Barnes-Christian seized Mr. Wilford when he approached him and asked about a firearm, Officer Barnes-Christian had reasonable, articulable suspicion that Mr. Wilford was armed and dangerous. Thus, the Court will deny the Motion to Suppress the firearm and accompanying evidence obtained from the seizure.

### A.       The Court Need Not Decide Whether Mr. Wilford Was Seized When Officer Barnes-Christian Approached Him and Asked Him About a Firearm

The United States does not contend that the interaction between Officer Barnes-Christian and Mr. Wilford did not, at some point, implicate the Fourth Amendment. Nor does Mr. Wilford. Rather, the parties dispute the moment at which Mr. Wilford was seized for Fourth Amendment purposes. In his Motion to Suppress, Mr. Wilford contends that he was "seized for purposes of the Fourth Amendment when his path was blocked by Officer Barnes-Christian as he exited a convenience store . . . he was singled out amongst others by Officer Barnes-Christian to

detain, and Officer Barnes-Christian subjected him to a series of rapid-fire questions about alleged firearm possession." (ECF No. 15, at 3.) For its part, the United States argues that Mr. Wilford "was not seized until he was escorted to the police cruiser," and that their interaction up until that moment constituted a "voluntary and consensual conversation[.]" (ECF No. 16, at 3, 6.)

The Court concludes that the video evidence is ambiguous regarding whether Officer Barnes-Christian blocked Mr. Wilford's path when Officer Barnes-Christian stood in front of him as he left the convenience store and asked him about a firearm. But that does not end the analysis.

### 1.    Legal Framework:  Seizure by Show of Authority

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment's protections, however, "do[] not extend to all police-citizen encounters." *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *United States v. Jones*, 678 F.3d 293, 298–99 (4th Cir. 2012)). "[O]nly when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). When physical force is absent, "a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the defendant." *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis omitted)).

To determine whether law enforcement officers have displayed a show of authority sufficient to implicate the Fourth Amendment, a court applies the objective test outlined in *Mendenhall*, 446 U.S. 544. *Id.* "The police have done so 'only if, in view of all of the

circumstances surrounding the incident, a reasonable person would have believed that [they were] not free to leave.'" *Id.* (quoting *Mendenhall*, 446 U.S. at 554). Cases in the United States Court of Appeals for the Fourth Circuit "have enumerated six broad, non-exclusive categories of facts that may be relevant" to a court's analysis of the circumstances surrounding the incident: (1) how many officers were present; (2) whether officers were in uniform and/or displayed firearms; (3) whether any officer touched the defendant or made any attempt to block or restrain his movement; (4) whether the officer's questioning was conversational rather than intimidating; (5) whether the officer informed the defendant that the officer suspected [the defendant] of illegal activity, or treated the encounter as routine; and, (6) whether the officer asked for identification and how quickly the officer returned it to the defendant. *United States v. Cloud*, 994 F.3d 233, 242–43 (4th Cir. 2021) (citing cases).

For a seizure to occur, "the defendant must actually submit to [the law enforcement officer's] show of authority." *Cloud*, 994 F.3d 233 at 242 (citing *Stover*, 808 F.3d at 995). "That submission need not be explicit; it can take the form of 'passive acquiescence.'" *Id.* When determining whether a defendant has submitted to a show of authority through "passive acquiescence, the relevant test . . . is that enunciated in *Mendenhall.*" *Stover*, 808 F.3d at 995–96 (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007) (internal quotation marks omitted)). "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing [person] is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin*, 551 U.S. at 262 (finding that the passenger of a stopped car "had no effective way to signal submission while the car was still moving on the roadway, but once it came to a stop he could, and apparently did, submit by staying inside").

### 2. The Court Concludes that the Video Evidence is Ambiguous Regarding Whether Officer Barnes-Christian Blocked Mr. Wilford's Path As He Was Exiting the Convenience Store

Parties presented conflicting testimony at the hearing regarding whether the initial interaction between Officer Barnes-Christian and Mr. Wilford was consensual. On one hand, Officer Barnes-Christian testified that he "backed up" as Mr. Wilford was exiting the store. (Tr. 14:1–5.) On the other hand, Mr. Wilford testified that when he "was exiting the store, [Officer Barnes-Christian] stepped in [his] path for [him] walking around" such that he did not "have [any] other choice but to interact with him." (Tr. 34:19–24.) Upon review, the Court must say that the body camera footage admitted into evidence at the hearing is ambiguous regarding whether Officer Barnes-Christian blocked Mr. Wilford's path when Officer Barnes-Christian stood in front of him as he left the convenience store and asked him about a firearm. This does not, however, prevent a decision being reached today.

### B. Even Assuming Without Deciding That Mr. Wilford Was Seized When Officer Barnes-Christian Approached Him and Asked Him About a Firearm, There is No Fourth Amendment Violation Because Officer Barnes-Christian Had Reasonable, Articulable Suspicion that Mr. Wilford Was Armed and Dangerous

Even assuming without deciding that Officer Barnes-Christian seized Mr. Wilford for constitutional purposes when he approached Mr. Wilford as he left the convenience store, the investigatory stop of Mr. Wilford was lawful at its inception. Officer Barnes-Christian, an experienced police officer, saw Mr. Wilford walking out of a convenience store, late at night, while clutching his arm to his side in a manner consistent with the officer's "previous encounters with people with firearms." (Tr. 31:16–22.) The video plainly shows Mr. Wilford holding his arm in an unnatural position, and Officer Barnes-Christian asking within seconds whether Mr. Wilford had "a concealed permit for that firearm right there." (Govt. Ex. 1, at 00:29:19–21;

8

Govt. Ex. 1A, at 1.) Thus, Officer Barnes-Christian had a reasonable, articulable suspicion that Mr. Wilford was armed and dangerous.

### 1.    Legal Framework:  Investigatory Stops

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment's "protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry*, 392 U.S. at 9). These protections allow an officer to lawfully stop and briefly detain a person for investigative purposes (a "*Terry* stop") when the officer has a "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry*, 392 U.S. at 30.

"Reasonable suspicion" is a "less demanding standard than probable cause and requires a showing considerably less than a preponderance of the evidence." *Wardlow*, 528 U.S. at 123. To satisfy the standard, an officer need only "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry*, 392 U.S. at 21. The suspicion must also be objectively reasonable based on those facts. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

To determine whether an officer had such a specific, articulable, and objective basis to "'suspect[] legal wrongdoing,' 'reviewing courts . . .must look at the totality of the circumstances of each case'" based on the facts known to the officer at the time of the seizure. *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018) (quoting *Arvizu*, 534 U.S. at 273). The facts available at the time of the seizure "must be seen and weighed . . . as understood by those versed in the field of law enforcement." *Cortez*, 449 U.S. at 418 (finding that objective facts that would be

9

meaningless to the untrained, afford a legitimate basis for suspicion when used by trained law

enforcement officers); *see also Arivzu*, 534 U.S. at 273 (stating that officers can "draw on their

own experience and specialized training to make inferences from and deductions about

cumulative information available to them that 'might well elude an untrained person'").

Reasonable articulable suspicion "does not deal with hard certainties, but with

probabilities," so "an officer's articulated facts must in their totality serve to eliminate a

substantial portion of innocent travelers before reasonable suspicion will exist." *United States v.*

*McCoy*, 513 F.3d 405, 413 (4th Cir.), *cert. denied*, 553 U.S. 1061 (2008) (each of an officer's

articulated facts *on its own* is not required to eliminate every innocent traveler and establish

reasonable suspicion). Courts apply "commonsense and [a] contextual approach in evaluating

the validity of an investigatory detention." *United States v. McBride,* 676 F.3d 385, 392 (4th Cir.

2012).

While an officer's "mere hunch," *Arivzu*, 534 U.S. at 274, or reliance on an

uncorroborated anonymous tip, *United States v. Brown*, 401 F.3d 588, 595–96 (4th Cir. 2005),

insufficiently supports "reasonable suspicion," the standard is not a particularly onerous one.

*See, e.g., McCoy*, 513 F.3d at 412–13 (experienced officer's observation of vehicles moving

between parking lots where drug sales had previously occurred and without occupants entering

the stores sufficient to constitute reasonable articulable suspicion).

> 2.      **Officer Barnes-Christian Had Reasonable Articulable Suspicion that Mr. Wilford was Armed and Dangerous Because He Observed Him Leaving a Store, Late at Night, While Clutching his Arm in a Manner Consistent with the Officer's Experience Dealing With Armed Suspects**

Officer Barnes-Christian had reasonable articulable suspicion to seize Mr. Wilford as he

was walking out of the convenience store late at night because he saw Mr. Wilford clutching his

arm to his side as if holding something in place. (Tr. 19:17–20:2.) Consideration of the "the

totality of the circumstances," as understood by those versed in the field of law enforcement,

reveals that Officer Barnes-Christian had a reasonable, articulable suspicion that Mr. Wilford

was armed and dangerous, which supported the investigatory action. *Kehoe*, 893 F.3d at 237

(quoting *Arvizu*, 534 U.S. at 273); *Cortez*, 449 U.S. at 418. The Court will address the relevant

factors in turn.[5]

> **a.  Officer Barnes-Christian's Observations at the Scene Merit
> Substantial Weight**

Officer Barnes-Christian observed Mr. Wilford with "his right arm clutched to is side" in

what Officer Barnes-Christian credibly testified was "an abnormal position."[6] (Tr. 19:25; 20:1–

2.) The video bears this out, as does his question—seconds in—about whether Mr. Wilford had

a "nine," meaning a nine millimeter weapon. In forming a basis for reasonable suspicion, law

enforcement officers may "draw on their own experience and specialized training to make

inferences from and deductions about cumulative information available to them that 'might well

---

[5] The United States argues that Officer Barnes-Christian had reasonable articulable suspicion "at the point that Officer Barnes-Christian asked about the firearm" in part based on "Wilford's lack of response and looking away when asked if he possesses a concealed weapons permit for the firearm in his possession" and "Wilford's response when told it was illegal to have a concealed weapon without a permit, along with his admission that it was a 'nine.'" (ECF No. 16, at 10–11.) The Court cannot consider these factors because they occurred after "the point that Officer Barnes-Christian asked about the firearm[.]" (ECF No. 16, at 10.) Events that occur after a seizure cannot support whether an officer had reasonable articulable suspicion to justify the seizure in the first place. *See United States v. Curry*, 965 F.3d 313, 320 (4th Cir. 2020) (finding that if the initial stop was unlawful, a defendant's subsequent actions cannot make the stop legal); *United States v. Black*, 707 F.3d 531, 539 n.5 (4th Cir. 2013) (finding that factors purported to support reasonable articulable suspicion were "irrelevant because they occurred after [the defendant] was seized").

[6] Consistent with his testimony, seconds into their interaction, Officer Barnes-Christian asked Mr. Wilford whether he had "a concealed permit for that firearm right there[.]" (Govt. Ex. 1, at 00:29:20–21.) Officer Barnes-Christian subsequently recovered a weapon from inside Mr. Wilford's jacket—at the place where he had pointed to seconds earlier.

elude an untrained person.'" *Arivzu*, 534 U.S. at 273 (internal citations omitted). Officer Barnes-Christian confirmed that he had been involved in over 150 firearm investigations in the past two years, many of which involved concealed weapons. (Tr. 18:22–19:3.) The Court accords substantial weight to the observations of Officer Barnes-Christian, a trained police officer with experience in investigating and apprehending armed and dangerous individuals.

### b.   Mr. Wilford's Presence in a High Crime Area Merits a Modicum of Weight

The Court gives only some weight to the United States's first basis for reasonable articulable suspicion: that the stop occurred in a high-crime area. Mr. Wilford seems to concede this characterization. (ECF No. 19 at 3 ("The only circumstance from *Black* that is also present in this case is the presence of Mr. Wilford in what the police will likely categorize as a 'high crime area.'"). However, "simply being in an area where crime is prevalent is minimally probative in the reasonable suspicion analysis." *Wingate v. Fulford*, 987 F.3d 299, 306 (4th Cir. 2021), *as amended* (Feb. 5, 2021) (citing cases). An officer could not reasonably infer that Mr. Wilford was armed and dangerous based solely on his presence in a high-crime area. However, a defendant's presence in a high-crime area may combine with other factors, such as the officer's observations at the scene, to form a basis for reasonable articulable suspicion. *See id.* (stating that "'factors susceptible to innocent explanation individually may suffice to form a particularized and objective basis when taken together'" (quoting *United States v. Slocumb*, 804 F.3d 677, 682 (4th Cir. 2015) (internal quotation marks omitted). Accordingly, the Court accords a modicum of weight to this additional basis for Officer Barnes-Christian's reasonable suspicion that Mr. Wilford was armed and dangerous.

### c.      The Time of the Stop Merits Some Weight

The Court also assigns a modicum of weight to the fact that the stop occurred at

approximately 12:30 a.m.  Without more, a traffic stop occurring at night "does little to suggest

criminal activity." *Wingate*, 987 F.3d at 306 (discussing traffic stop that occurred at 1:39 a.m.).

Nevertheless, an early-morning stop could "alert a reasonable officer to the possibility of

danger," entitling this factor to some weight under the totality of the circumstances. *United*

*States v. George*, 732 F.3d 296, 300 (4th Cir. 2013).  Officer Barnes-Christian credibly testified

that the time and location of the interaction informed his formation of reasonable articulable

suspicion.  (Tr. 10:10–15; 40:13–42:23.)

### d.      The Totality of the Circumstances Gave Rise to Reasonable Articulable Suspicion that Mr. Wilford was Armed and Dangerous

Under the totality of the circumstances, Officer Barnes-Christian had reasonable

articulable suspicion that Mr. Wilford was armed and dangerous.  After midnight while

conducting a merchant check in a high-crime area, Officer Barnes-Christian saw Mr. Wilford

leaving a convenience store with his arm awkwardly clutched to his right side in what the officer

considered to be a position consistent with his experience of people concealing a firearm.

Together, these circumstances would justify an officer in Officer Barnes-Christian's position to

reasonably suspect that Mr. Wilford was armed and dangerous.

Accordingly, Mr. Wilford did not meet his burden to prove by a preponderance of

evidence that Officer Barnes-Christian violated his Fourth Amendment rights by stopping Mr.

Wilford.

## III. Conclusion

For the foregoing reasons, the Court will DENY Mr. Wilford's Motion to Suppress.

(ECF No. 15.)

An appropriate Order shall issue.

Date: 1/30/25
Richmond, Virginia

_____ /s/
M. Hannah Lauck
United States District Judge